FIRST TRUST COMPANY,
INC., Appellant,

v.

UNION DEPOT PLACE LIMITED
PARTNERSHIP, et al.,
Defendants,

LeeAnn Chin, Inc., Thoele Printing,
Inc., Respondents.

FIRST TRUST NATIONAL
ASSOCIATION,
Appellant,

v.

CONTINENTAL CABLEVISION OF
ST. PAUL, INC., Respondent.

WELSH COMPANIES, Plaintiff,

v.

CONTINENTAL CABLEVISION OF
ST. PAUL, INC., Defendant.

In the Matter of the TRUSTEESHIP
CREATED BY the HRA of the
CITY OF ST. PAUL.

No. C1–91–1119.

Court of Appeals of Minnesota.

Oct. 15, 1991.

Review Denied Dec. 13, 1991.

Patrick J. McLaughlin, Eric B. Nilsson, Oppenheimer, Wolff & Donnelly, Minneapolis, for plaintiff.

William W. Rosen, David D. Meyer, William P. Simons, Rosen, Meyer & Simons, St. Paul, for LeeAnn Chin, Inc.

James A. Geske, O'Neill, Burke, O'Neill, Leonard & O'Brien, Ltd., St. Paul, for Thoele Printing, Inc.

John G. Hoeschler, Robert A. Alsop, Holmes & Graven, Ch., Minneapolis, for Continental Cablevision of St. Paul, Inc.

Considered and decided by DAVIES, P.J., PARKER, and AMUNDSON, JJ.

## OPINION

PARKER, Judge.

First Trust National Association appeals from a judgment denying its request for instructions to disburse money in a reserve fund to the bondholders and instead ordering the trustee to pay for operating deficits and emergency repairs of a building it owns. We affirm.

## FACTS

This case arises from consolidation of four cases involving commercial property in St. Paul known as the Union Depot Place. They include a declaratory judgment, a lease dispute, a mortgage foreclosure action, and a petition for trustee's instructions.

In 1983, the Housing and Redevelopment Authority of St. Paul issued commercial development revenue bonds to rehabilitate the property. Several hundred people ("bondholders") bought them. First Trust was selected as trustee to act for the benefit of the bondholders in administering the bond transactions. First Trust lent the proceeds of the bonds to a developer to renovate the property. To secure its obligation to repay, the developer gave First Trust a mortgage and a letter of credit.

The developer defaulted in 1987. At that time, the property was appraised at $1,000,000. To protect the bondholders, First Trust drew on the letter of credit and deposited the proceeds in a bond reserve fund. It also commenced an action to foreclose the mortgage on the property. The district court appointed Welsh Companies as receiver of the Union Depot to assume legal control and possession of the property during the foreclosure process. First Trust complied with the receiver's request for cash advances to cover deficits in operating the property.

In June 1990, parts of the ramp ceiling fell on cars.

On August 29, 1990, First Trust purchased the Union Depot at the sheriff's auction. At the end of October an engineering study reported the ramp was unsafe and the basement and sub-basement should be vacated immediately. One of the tenants, Thoele Printing, Inc., used this space. First Trust then had the property appraised. The appraiser who had originally valued the property at one million dollars now indicated the cost of repair exceeded the potential value of the property; the property, he reported, now had either *no* value if the ramp were not repaired, or a negative value of one million if the ramp were repaired. First Trust then discontinued advancing monies from the bond reserve fund to pay for operating deficits and

for repairs, because it determined that no value could be realized from the property.

Reasoning that the fund was the one source from which the bondholders could recover their losses, First Trust petitioned under Minn.Stat. § 501B.16 (1990) for instructions regarding administration of the trust. It requested that the court instruct First Trust to forego making further advances to fund operating deficits, declare that First Trust had no obligation to any tenant to fund repairs or operating deficits, and authorize First Trust to disburse the proceeds in the fund to the bondholders.

A tenant, Continental Cablevision of St. Paul, Inc., moved for a temporary restraining order compelling First Trust to advance cash from the reserve fund to cover operating deficits, claiming that First Trust had become the owner and had an obligation to keep the property operating. First Trust denied the claim on two bases. First, a provision in the tenants' lease limited a tenant's remedy to the owner's interest in the building itself. Second, First Trust was entitled to rescission of the foreclosure sale because of the post-sale discoveries. Therefore, First Trust argued, it should no longer be considered an owner, as alleged by the tenants. The trial court denied the motion for a temporary restraining order.

The trial court assigned to hear the consolidated cases scheduled a hearing to address several issues. The court ruled it would determine the extent of First Trust's obligation, if any, to the tenants to repair and to continue operation of the property and decide whether First Trust was entitled to rescission of the foreclosure sale. The court also agreed to consider evidence and arguments on First Trust's petition for instructions and the Welsh Companies' motion to withdraw as receiver.

The receiver, a representative of First Trust, a structural engineer, a general contractor and an appraiser testified. Following trial, the court refused to rescind the foreclosure sale, denied First Trust's petition to allow it to disburse the fund to the bondholders, and denied the receiver's motion for termination. The trial court direct-

ed First Trust to pay for the costs of the receivership.[1] First Trust was ordered to pay for operating deficits and emergency repairs during the time the court intended to issue its instructions. The trustee was directed to have the building surveyed to determine its potential for collapse and to present a report detailing financing for improvements which would enhance the value of the property.

On appeal from this judgment, the trustee challenges the trial court's determination that it must use the reserve fund to operate and repair the property.

## ISSUES

1. What is the appropriate standard of review?

2. Was it an abuse of discretion for the trial court to order First Trust to pay for operating deficits and emergency repairs?

## DISCUSSION

### I

■ First Trust claims that when the evidence is partly oral and the balance is written or deals with undisputed facts, the reviewing court may ignore the trial court's findings and substitute its own if one of two circumstances exists: the written evidence or some undisputed fact renders credibility of the oral testimony doubtful, or the findings rest exclusively on written evidence or undisputed facts. For support, it cites *In re Trust Known as Great Northern Iron Ore Properties*, 308 Minn. 221, 243 N.W.2d 302, 305 (1976), *cert. denied* 429 U.S. 1001, 97 S.Ct. 530, 50 L.Ed.2d 612 (1976).

■ We disagree. Minn.R.Civ.P. 52.-01, as amended in 1985, effectively overruled *Great Northern,* and the standard of review of the trial court's findings is "clearly erroneous." The rule states:

> Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity

---

1. The receiver was discharged when the statutory period of redemption ended, June 6, 1991.

of the trial court to judge the credibility of the witnesses.

The rule does not distinguish between oral or documentary evidence. Consequently, the reviewing court should not reverse the trial court's findings unless it is left with the definite and firm conviction the trial court made a mistake. *Cherne Indus., Inc. v. Grounds & Assoc., Inc.*, 278 N.W.2d 81, 88 (Minn.1979). The evidence and its reasonable inferences must be viewed in the light most favorable to the prevailing party. *State, Dep't of Pub. Welfare v. Thibert*, 279 N.W.2d 53, 56 (Minn.1979).

## II

First Trust had the option to foreclose or not. The trial court correctly determined that First Trust, having foreclosed and purchased the property, became the owner with rights and liabilities under the lease and that it was not entitled to rescission of the foreclosure sale, because it bought the building with notice of the defects and operating deficit.

First Trust argues that, assuming it is the landowner of the property, its obligation to the tenants is governed by the terms of the lease, which limits the tenants' remedies to the owner's interest in the building. The tenants' right to receive operating services, First Trust asserts, can be satisfied only from the value of the Union Depot and not from the proceeds of the letter of credit deposited in the reserve fund. The trustee also asserts that the court's determination that First Trust must use the reserve money to operate and repair the building was based on the legal determination that First Trust was now the owner and was not based on equitable considerations.

We are unpersuaded by these arguments. By requesting rescission and by petitioning for instructions under Minn. Stat. § 501B.16 (1990), First Trust invoked the equitable jurisdiction of the court. *See Congdon v. Congdon*, 160 Minn. 343, 355, 200 N.W. 76, 80 (1924) (court of equity has power to direct execution of an express trust on request from trustees for guidance in the performance of their duties);

*Bauer v. O'Brien Land Co.*, 144 Minn. 130, 135, 174 N.W. 736, 738 (1919) (rescission is an equitable remedy). "When a court of equity once takes jurisdiction of a case it is its duty to determine all rights and obligations pertaining to the subject matter and to grant full measure of relief." *Bauer*, 144 Minn. at 135, 174 N.W. at 738.

Having denied rescission, the court was also justified in refusing to authorize disbursement of the fund because, as owner, First Trust was exposed to possible liability to the tenants and to the city.

A. *Liability to tenants.* The tenants were not necessarily precluded by the lease provisions, because First Trust may be liable independent of the leases. First Trust's actions are alleged to have reduced the value of the property to a point at which the tenants have no effective remedy under the leases. Whether First Trust's conduct aggravated both the economic and physical decline of the building is a question of fact for later determination.

The trial court's findings that the property was in possible danger of imminent collapse and that the potential for collapse resulted during First Trust's caretaking are supported by the evidence. When the ramp ceiling fell on cars in June 1990, it was discovered that the problem was caused by gradual corrosion due to water and salt from cars parked in the ramp. The structural problems, however, resulted from a long history of deferred maintenance. The situation was sufficiently serious that an October 1990 structural engineering report advised the receiver to vacate the basement and sub-basement, which Thoele Printing leased. The same month, the city condemned the ramp.

At trial an expert testified that the structural problems might extend beyond the ramp to the building, which the previous report had not studied. The expert believed it necessary to investigate the structural integrity of the building as soon as possible to determine whether it might collapse.

Based on the finding that the building might collapse, it was within the court's

equitable powers to require First Trust to pay for emergency repairs and to pay for the structural engineering study. Evidence showed First Trust did not actively work to increase rental income by making the building desirable to potential tenants. It did not improve the leaseholds to attract a government agency as a potential tenant and it did not pursue the city's generous offer to connect the building to a skywalk if First Trust would contribute a minor fraction of the cost. The court ordered a report on financial commitments for improvements which could increase the building's value by increasing rental income. Evidence also suggested that the building's rental value might be greater than the appraiser's estimate, since the appraisal understated the rental income. Requiring the trustee to continue to pay operating deficits until further order was within the equitable powers of the court.

**B. *Liability to city.*** As owner, First Trust was exposed to possible liability to the city if the building were closed. An owner has a duty to make its premises secure as a matter of public safety and may be liable for the cost of razing it if necessary.[2] Minn.Stat. § 463.16 (1990) provides:

> The governing body of any city or town may order the owner of any hazardous building or property within the municipality to correct or remove the hazardous condition of the building or property or to raze or remove the building.

First Trust argues that, assuming it is the landlord and owner, it should be permitted to close the building if continued operation endangers public safety. Closing the building, it claims, is more effective than correcting the hazardous condition.

We are unconvinced by this argument. Closing the building would not correct the problems of falling facade and possible collapse of the ramp. Allowing the trustee to walk away from the building would shift to the public responsibility for razing or repairing the building.

First Trust also contends that when the foreclosure sale occurred, it had no reason to anticipate the magnitude of the structural problems and that the negative value of the property is due to no fault of First Trust. *If* it had a duty to repair, the trustee argues, the duty must be excused because repairing the building would place an extraordinary drain on the bondholders' money. For support, it cites *Burgi v. Eckes*, 354 N.W.2d 514, 518 (Minn. App.1984) (relieving landowner of duty to repair when, through no fault of his own, unanticipated building repairs became so economically disadvantageous as to become an economic impossibility).

The situation in this case is not like that in *Burgi*, because in this case the repairs were anticipated and the court found the state of potential collapse happened during First Trust's caretaking. The official statement of the project warned prospective bondholders that the 65–year–old structure could contain hidden defects which could increase rehabilitation costs and make the project economically unfeasible. Five years before foreclosure the city closed some of the parking stalls in the sub-basement because of falling concrete and difficulties with the structural ceiling. First Trust bought the building two months *after* the ramp ceiling fell on cars as a result of deferred maintenance. Therefore, *Burgi* does not support First Trust's position that its obligation to make emergency repairs is excused.

**C. *Petition for instructions.*** The petition for instructions gives the court supervisory control over the trustee to protect the trustee when the meaning of the trust instrument is in doubt. *In re Warner's Trust*, 275 Minn. 174, 179–80, 145 N.W.2d 542, 546 (1966). The court may exercise its equitable authority to protect beneficiaries against the trustee's ineffici-

2. We note that the Union Depot was entered in the National Register of Historic Places maintained by the United States Department of the Interior. All proposed changes to the historic or architecturally significant elements of the structure are reviewed with the State Historical Preservation Office before implementation. The record contains no evidence of possible razing.

ency, incompetency or neglect. *Wertin v. Wertin*, 217 Minn. 51, 54, 13 N.W.2d 749, 751–52 (1944). The court's jurisdiction continues until jurisdiction is transferred to another court or terminated by court order. Minn.Stat. § 501B.24 (1990).

We consider the order for emergency repairs, operating expenses and a financial report to be in the nature of an interim order, since it is apparent that further hearings at the trial court level are contemplated. The court logically concluded it was in the best interests of the bondholders to protect their property by determining the potential for imminent collapse and preventing it by requiring First Trust to make emergency repairs. The court may have concluded it was in the bondholders' interest to keep the building operating, at least until more study was done on the potential to increase the property's value. Given the invocation of equitable jurisdiction, we do not believe the trial court abused discretion by making an appropriate order. *See* Minn.Stat. § 501B.21 (1990).

## DECISION

We affirm the trial court's order requiring First Trust to continue to fund operating deficits and emergency repairs until further order of the court as within the trial court's equitable jurisdiction.

Affirmed.